**James TURNER, James Petty, and L.R. McGaugh, Plaintiffs-Appellants,**

v.

**LOCAL LODGE # 455 OF THE INTERNATIONAL BROTHERHOOD OF BOILERMAKERS, IRON SHIP BUILDERS, BLACKSMITHS, FORGERS AND HELPERS, AFL–CIO, et al., Defendants-Appellees.**

No. 83–7620.

United States Court of Appeals, Eleventh Circuit.

March 20, 1985.

Charlie D. Waldrep, Gregory M. Deitsch, Birmingham, Ala., for plaintiff-appellant James Turner.

Carol Ann Rasmussen, Birmingham, Ala., for plaintiffs-appellants James Petty & L.R. McGaugh.

Robert H. Stropp, Jr., Birmingham, Ala., for Union & Lodges.

Joseph W. Moreland, Kansas City, Kan., for all defendants-appellees.

Before HENDERSON and HATCHETT, Circuit Judges, and NICHOLS *, Senior Circuit Judge.

NICHOLS, Senior Circuit Judge:

These two cases, consolidated for trial, were brought in the Northern District of Alabama, 528 F.Supp. 1008, to recover damages for an alleged breach of the "Bill of Rights" provision of the Labor-Management Reporting and Disclosure Act (LMRDA), in that the three plaintiffs, contrary to 29 U.S.C. § 411(a)(5), were "otherwise disciplined" by Local Lodge 455, their union, without the notice of "specific charges" and the remaining panoply of due process protections that the statute requires. After a trial before a jury, the court ordered a verdict for the defendants. The judge's statements from the bench explain his ruling as turning on the lack of support offered in substantial evidence for the proposition relied on by the plaintiffs, i.e., that the "discipline" meted out to them was really retaliation for membership of some of them in a body of "Concerned Boilermakers" who sought establishment of a new local at Birmingham, Alabama, which top union officials did not want, and not for participation in an illegal strike, as defendants undertook to show. We agree that substantial evidence to show such retaliation was not offered, and therefore *affirm.*

## Facts

The plaintiffs are or were boilermakers by trade and union members. When boilermakers were wanted on a construction job, an agreement between the parent union and participating building contractors called "Southeastern States Articles of Agreement" (Articles of Agreement) provided that the contractor would request the union to provide the men, and would employ those sent by the union if qualified. The union's business agent would select names for referral from an "out of work list" (list) which it was his duty to maintain. The controversy resulted from an instance where the men so referred, the plaintiffs, arriving at the work site, found it picketed by a large and belligerent body of another trade, pipefitters. It was agreed, for purposes of this case, that their acts and presence were illegal. Nevertheless, the referred boilermakers made no attempt to pass through the picket line, and this impasse continued unbroken for several days. Finally, after a weekend, the boilermakers appeared at the work site in a large body, led by the business agent, while the number of pipefitters was greatly shrunken. The newly recruited boilermakers went right through the line, but the body, including the plaintiffs, who had held off the previous week, continued to do so, standing apart. Soon thereafter an official of the contractor came out from the job site and handed termination notices to all that group, asserting absenteeism as the ground.

The record reflects a fear by the union that it would be in serious trouble if it could not improve its record of complying

* Honorable Philip Nichols, Jr., U.S. Circuit Judge for the Federal Circuit, sitting by designation.

with its agreements with employers, and this of course involved not honoring illegal picket lines and thereby making the boilermakers abettors of illegal conduct by others.

The whole matter is dealt with in a series of documents which were in evidence. The Articles of Agreement already mentioned provide:

1.4.4. There will be no recognition of any unauthorized or illegal picket line established by any person or organization, and the international and local officers of the Union will immediately upon being informed that such a situation exists, order all employees to cross such picket line.

The Joint Referral Committee Standards entered into by employers and union provides that a registrant is not to be referred for employment from the out of work list for 90 days after—

4. Involvement in any unauthorized strike, work stoppage, slowdown, or any other activity having the effect of * * * disrupting the job.

\* \* \* \* \* \*

6. Insistence on recognizing illegal or unauthorized picket lines.

This 90-day exclusion from referral was often called "benching" in the record of this case. It is noteworthy that this same document provides that the list is to be open to qualified boilermakers on application whether or not they are union members, and when referrals are made from the list they are to be made without discrimination between union and nonunion members.

The employer demanded in writing that the rules be applied to seven men, including plaintiffs herein, and accordingly the Union Rules Committee notified all business agents nationwide, effectively blacklisting the offenders. Turner was obliged to quit a job he had found in Florida. At the time of trial the three plaintiffs did not yet have work as boilermakers though the 90 days had long since expired. They were restored to the bottom of the out of work list, not to their previous seniority, apparently.

## Discussion

■ The alleged illegality of the 90-day "benching" of the plaintiffs is solely a question under 29 U.S.C. § 411(a)(5) and (b)—

No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

(b) Any provision of the constitution and by-laws of any labor organization which is inconsistent with the provisions of this section shall be of no force or effect.

Plaintiffs undertook to show that the ostensible reason for "benching" was not the real reason. They asserted the purpose of the union leadership was retaliation against plaintiffs for their activities in connection with some "Concerned Boilermakers" who wanted a new local having headquarters in Birmingham. They believed Local 455 did not represent them adequately. It is located at Muscle Shoals, Alabama. But there is no evidence of threats by union officials against this body, indeed, nothing shows they took any notice of it whatever. That their reaction was so extreme as to resort to "benching" is wholly the notion of plaintiffs' counsel, without evidentiary support. The district judge, by his statements during the trial, believed that plaintiffs must produce substantial evidence that retaliation was the true motive. He took the case away from the jury because retaliation was not shown except as a mere surmise of no weight against the powerful motive afforded by contract obligations under the Articles of Agreement, with employers who accepted unionization, so compelling that defendants argued with much plausibility that the "benching" was a "ministerial act" as to which they had no choice. The law is

to be applied, therefore, on the basis that the ostensible reason for the "benching" was the real reason, and as to this the district judge had no difficulty, nor do we.

The statutory language quoted is the concluding part of § 411, which is called the "Bill of Rights" and was so called during the pendency of the LMRDA in 1959. *See* H.R.Rep. No. 741, Part III, *reprinted in* 1959 U.S.Code Cong. & Ad. News 2318, 2429, 2453. The natural supposition is that the sweeping language of § 411(a)(5) cannot be read out of context, but must be taken as backing and support for union members in exercising their "Bill of Rights" and that any union disciplinary measure unrelated to the "Bill of Rights" is not covered. Plaintiffs obviously paid obeissance to this view in seeking, as they did, to show that their "benching" was retaliation for forming the "Concerned Boilermakers."

 The leading Supreme Court case is *Finnegan v. Leu,* 456 U.S. 431, 102 S.Ct. 1867, 72 L.Ed.2d 239 (1982), in which a newly elected union president dismissed business agents who had supported his opponent from their posts as business agents. He did not attempt to impair their status as union members. It was held that the Act protected the status of the business agents as union members, not as paid union officials. The word "discipline" refers only to a retaliatory act that would affect a union member's rights or status as a *member* of the union. The "benching" here, of course, does not do that because one is not required to belong to the union to be carried on the out of work list, and be referred to prospective employers when one's turn arrives.

*Miller v. Holden,* 535 F.2d 912 (5th Cir. 1976), involves a somewhat similar issue of dismissal of a union official as an official, not as a member, and reaches the same result. Regarding § 411(a)(5) the court says at 914–15—

> "Discipline" is not defined by the LMRDA and, as the commentators have uniformly acknowledged, the legislative history of the Act is unenlightening.

These circumstances make application of the maxim of *ejusdem generis* particularly appropriate. We therefore construe the general term "discipline" to conform to the essential character of the specifically enumerated types of discipline—fine, expulsion, and suspension. This process causes us to focus on the motivation of the union conduct and the manner in which the penalty is enforced. Union action which adversely affects a member is "discipline" only when (1) it is undertaken under color of the union's right to control the member's conduct in order to protect the interests of the union or its membership, and (2) it directly penalizes him in a way which separates him from comparable members in good standing. [Footnotes omitted.]

*Hackenburg v. International Brotherhood of Boilermakers,* 694 F.2d 1237 (10th Cir.1982), is of special interest because it involves a 90-day "benching" just as here and for the same reason, *i.e.,* to carry out the provisions of a collective bargaining agreement. The court cites and follows *Finnegan v. Leu* so far as the latter holds that the words "to otherwise discipline" means to take an action which would work to the detriment of the "Bill of Rights" in securing democratic and responsive union government. The court noted that the issue before it was different in that the "benching" was to carry out a collective bargaining agreement. Nevertheless, *Finnegan v. Leu* establishes the important principle that an act by the union to be "otherwise disciplined" must affect a member's rights or status as a union member.

The *Hackenburg* court also had before it a cross-appeal involving the issue whether in making and enforcing the agreement the union failed to give the "benched" members "fair representation." It was held it did; the benefits flowing to the union's members by its control of the "hiring hall" outweighed any detriment they suffered by being "benched" for taking individual action contrary to the agreement. The court concluded that "since the sanctions imposed were employment related rather than

internal union related, the safeguards in § 411(a)(5) are not available." *Id.* at 1240.

Here the plaintiffs failed to specify what defense they could have made at a hearing or how the § 411(a)(5) procedures would have been of any use to them if followed. In view of the Articles of Agreement, the result could not but have been the same. It seems apparent, as a matter of statutory construction, if § 411(a)(5) were construed to apply to removal of a person from, or addition of a person to, a referral list, when a contract duly made by the union so requires, the statute would require a useless ritual. We cannot attribute such an intent to Congress. It would simply provide a forum for the employee to demand that the union breach its contract. If the employee had anything else to offer, *e.g.*, retaliation for exercise of a protected right, the case might be different. Plaintiffs, in effect, take the untenable position that the "Bill of Rights" converts into a protected activity what would otherwise be a simple breach of contract.

We appreciate the importance of construing statutes according to their terms. Sometimes, however, as in *United Steelworkers of America v. Weber*, 443 U.S. 193, 201, 99 S.Ct. 2721, 2726, 61 L.Ed.2d 480 (1979), the court encounters language which is broader, removed from its context, than the entire context read all together indicates was probably intended. A too broad interpretation of § 411(a)(5) would frustrate and defeat other provisions that seek to establish a reign of law in labor controversies. Nor can it be said that § 411(a)(5) is wholly free from ambiguity even read by itself. Congress says the members may not "be fined, suspended, expelled, or otherwise disciplined * * *." Such language always has a built-in ambiguity whether the last and most sweeping term here, "or otherwise disciplined," is to be read as the fifth circuit read it, by *noscitur a sociis*, as things in the general category of its predecessors, or whether it is virtually to be taken as so sweeping as to make all the rest surplusage. We opt for the former here.

*Conclusion*

In view of the foregoing, the judgment of the district court is

AFFIRMED.